PM ONE, LTD v DEPARTMENT OF TREASURY


Docket No. 210644. Submitted November 10, 1999, at Lansing. Decided March 17, 2000, at 9:20 A.M.

P.M. One, Ltd., a corporation engaged in the management of real estate developments for the owners of the developments, contested in the Tax Tribunal a determination of the Department of Treasury that certain funds that PM One received were gross receipts subject to taxation under the Single Business Tax Act (SBTA), MCL 208.1 *et seq.*; MSA 7.558(1) *et seq.* The disputed funds were those taken from an individual client's separate depository fund kept in the client's name, which held the rents PM One collected for that client, that were then transferred into a central depository account. PM One would then issue a check equal to the amount of the client's funds transferred payable to a third-party vendor for goods or services provided by the vendor to the client's property. The Tax Tribunal agreed with the department's determination and affirmed its assessments. PM One appealed.

The Court of Appeals *held*:

1. PM One did not acquire either title to or possession of the goods and services. Although the Tax Tribunal concluded that the money flowing through the central depository account to the third-party vendors constituted consideration to PM One in the form of reimbursement, these transactions cannot be considered PM One's "sales" under the SBTA because PM One neither provided the disputed goods and services nor received or otherwise owned the consideration that flowed through the central depository account from the client's individual account to the third-party vendors.

2. To the extent that PM One might have ever "received" money that flowed into the central depository account, it did so solely on behalf of the client because of an express agency relationship. Therefore, the exception in the SBTA that excludes from "gross receipts" amounts received in an agency capacity solely on behalf of another applies in this case. The exception to the agency exclu-

sion pertaining to payment for or in consideration of sales or services made or rendered by the taxpayer or by others acting under the taxpayer's direction and control does not apply in this case. The Tax Tribunal erred in concluding that the exception to the agency exclusion applied.

3. Case law does not provide any meaningful construction of the SBTA that would convert the challenged transactions through the central depository account into taxable reimbursement to PM One. The challenged transactions are not part of PM One's gross receipts.

4. There is no merit to the department's indirect-payment theory that the Single Business Tax should apply to the challenged transactions because they passed through the central depository account and added value to PM One's business by allowing it to perform its management obligations under its contracts with its clients. Every time an agent performs contractual obligations the agent is ultimately working toward earning its management fee and thus benefits from being able to carry out the terms of an agency agreement. Managing the central depository account and drawing on it to pay third-party vendors did not, in and of itself, affect PM One's compensation for its work as an agent in any manner, whether directly or indirectly.

Reversed.

HOOD, J., dissenting, stated that the determination of the Tax Tribunal should be affirmed. The monetary transfer by PM One from the central depository account was not merely a funneling of funds from the client to a third-party vendor for goods and services received solely for the benefit of the client. The monetary transfer evidenced payment for goods and services for the client's interest that also discharged PM One's obligations under its management agreements. It is not clear from the record that none of the goods and services constituted PM One's inventory or stock in trade.

1. TAXATION — SINGLE BUSINESS TAX — WORDS AND PHRASES — SALE.

A "sale," for purposes of the Single Business Tax Act, is comprised of gross receipts arising from a transaction in which gross receipts constitute consideration for one of the following three conditions: one, the transfer of title to, or possession of, property that is stock in trade or other property of a kind that would be properly included in the inventory of the taxpayer or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business; two, the performance of services that constitute business activities other than those included in the first condition; three, any combination of the first and second condition (MCL 208.7[1]; MSA 7.558[7][1]).

2. TAXATION — SINGLE BUSINESS TAX — GROSS RECEIPTS — AGENCY EXCLUSION.

"Gross receipts," for purposes of the Single Business Tax Act, do not include the amounts received in an agency or other representative capacity solely on behalf of another or others; an exception to the agency exclusion from gross receipts applies to amounts received by persons having the power or authority to expend or otherwise appropriate such amounts in payment for or in consideration of sales or services made or rendered by themselves or by others acting under their direction and control or by such fiduciaries as guardians, executors, administrators, receivers, conservators, or trustees other than trustees of taxes received or collected from others under the direction of the laws of the federal government or of any state or local governments (MCL 208.7[3]; MSA 7.558[7][3]).

*Howard & Howard Attorneys, P.C.* (by *Michele L. Halloran* and *Donna M. Donovan*), for P.M. One, Ltd.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Jack Van Coevering*, Assistant Attorney General, for the Department of Treasury.

Before: SAWYER, P.J., and HOOD and WHITBECK, JJ.

WHITBECK, J. Petitioner P.M. One, Ltd. (PM One), appeals as of right from a decision of the Michigan Tax Tribunal, which held that certain amounts PM One collected constituted "gross receipts" under § 7 of the Single Business Tax Act (SBTA), MCL 208.7; MSA 7.558(7). The Michigan Tax Tribunal stated that "[t]he substance of these purchase, supply and payment arrangements is the reimbursement and compensation of Petitioner [PM One] for necessary expenses it incurs to provide the services required by the terms of its management agreement with an owner; accordingly, the amounts at issue are gross receipts of Petitioner." Here, the Michigan Tax Tribunal conflated two related, but logically separate, theories in order to impose liability under the SBTA. The

first theory is that the payments in question constituted "reimbursements" to PM One. The second theory is that the payments in question were indirect payments to PM One for performing management services and were therefore "compensation." As we outline below, we find both these theories to be incorrect because the payments in question neither fit within the definition of gross receipts nor, even if they were gross receipts, did they derive from the activities described in the SBTA. We therefore reverse.

I. BASIC FACTS AND PROCEDURAL HISTORY

PM One is a corporation engaged in the management of real estate developments. PM One's clients are property owners who hire petitioner to operate their properties. PM One's responsibilities include leasing properties, maintenance of the properties, purchase of goods and services, disbursements, document preparation, and coordination of activities with governmental housing agencies. In exchange for the performance of these functions, PM One receives a management fee, which is generally determined as a percentage of the rents collected.[1] In order to carry out its management agreement, PM One provides on-site staff members to collect rent, lease properties, order supplies, and coordinate services to occupants

---

[1] Michael McGhie, PM One's president, testified that the agreement with the individual clients varied. For example, a client could determine that it would maintain its own facilities and only require that PM One collect rent and pay out necessary expenses, essentially a limited accounting function. The fee for this type of agreement would be negotiated with the client and would be less than the compensation received for all-encompassing management of the property. However, during the relevant tax periods in this dispute, PM One did not have any clients acting under this type of limited management agreement.

of the property. Furthermore, PM One provides maintenance staff to perform necessary repairs to the property.[2] When a specific replacement or repair is required, PM One orders any necessary parts or goods and uses on-site personnel to make the repair or replacement. In the alternative, PM One retains outside contractors to furnish both goods and services.[3] In either event, the request for goods and services is issued in the name of the individual client. To cover a specific cost incurred for goods or services received, PM One transfers an equal amount of money from a client's individual account into a central depository account (CDA). PM One then issues a check, made payable to the proper third-party vendor, from the CDA to pay for the incurred cost.

The Department of Treasury (the department) audited PM One for the taxable period covering January 1, 1990, through December 31, 1992. The department concluded that there were deficiencies for tax years 1990 and 1992, when PM One employed the gross-receipts method in computing its business tax liability. While PM One had included its management fees and reimbursed compensation expenses for employees as gross receipts, it did not include payments made from the CDA to third-party vendors

---

[2] The compensation provided to the on-site personnel was reimbursed to petitioner by the client.

[3] PM One would negotiate the type of services that would be performed by on-site personnel and the type of services for which outside contractors would be called in for service. For example, a management agreement admitted during the Tax Tribunal hearing provided that independent contractors would be retained to repair air conditioning systems, electrical systems, elevators, and other "extraordinary repairs." It is important to note that this management agreement was not executed, was not in existence during the tax years in dispute, and was admitted subject to those limitations.

within its calculation of gross receipts. PM One asserted that excluding payments from the CDA was proper because the goods and services underlying the payments benefited the client only and could not be construed as PM One's gross receipts. PM One claimed that it did not retain warehouse goods on behalf of its clients and was not entitled to retain any goods or services in the event of termination of the management agreement. The department, however, concluded that PM One did not receive the funds in an agency capacity and the funds expended through the CDA should have been included as gross receipts. The Michigan Tax Tribunal affirmed the assessments and PM One appealed.

## II. THE SINGLE BUSINESS TAX ACT

The SBTA imposes "a specific tax of 2.35% . . . upon the adjusted tax base of every person with business activity in this state which is allocated or apportioned" to Michigan. MCL 208.31(1); MSA 7.558(31)(1). A taxpayer may elect to calculate this tax, known as the Single Business Tax (SBT), on the basis of the gross receipts it receives if its adjusted tax base exceeds a specified level. MCL 208.31(2); MSA 7.558(31)(2). By "gross receipts," the Legislature meant

> the sum of sales, as defined in subsection (1), and rental or lease receipts. Gross receipts does not include the amounts received in an agency or other representative capacity, solely on behalf of another or others but not including amounts received by persons having the power or authority to expend or otherwise appropriate such amounts in payment for or in consideration of sales or services made or rendered by themselves or by others acting under their

direction and control or by such fiduciaries as guardians, executors, administrators, receivers, conservators, or trustees other than trustees of taxes received or collected from others under direction of the laws of the federal government or of any state or local governments. [MCL 208.7(3); MSA 7.558(7)(3).]

Given this somewhat circular definition, what constitutes gross receipts depends largely on the meaning of "sales" in the SBTA.

The SBTA, MCL 208.7(1); MSA 7.558(7)(1), provides:

"Sale" or "sales" means the *gross receipts* arising from a *transaction or transactions* in which gross receipts constitute *consideration*: (a) for the transfer of title to, or possession of, property that is stock in trade or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the tax period or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business, or (b) for the *performance* of *services*, which constitute *business activities* other than those included in (a), or from any combination of (a) or (b). [Emphasis supplied.]

For the sake of analysis, we can break this lengthy formulation into a diagram with the following components:

A "sale" is comprised of

(1) "gross receipts"

(2) arising from a "transaction" in which gross receipts constitute "consideration" for one of the following described in (a), (b), or (c):

(a) transfer of title to, or possession of, property that is

(i) stock in trade; or

(ii) other property of a kind that would be properly included in the inventory of the taxpayer; or

(iii) property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business;

(b) "performance" of "services," that constitute "business activities"[4] other than those included in (a);

(c) any combination of (a) or (b).

Accordingly, we determine whether PM One owes SBT on the challenged transactions first in light of the definition of "sales" as defined in MCL 208.7(1); MSA 7.558(7)(1) and outlined above, and then in terms of the exclusions, exceptions, and other conditions in the definition of gross receipts in MCL 208.7(3); MSA 7.558(7)(3). We note that the structure of MCL 208.7; MSA 7.558(7) itself mirrors the form of this analysis, first defining "sales" and then defining "gross receipts."

### III. CONSIDERATION FOR TRANSFERS OF PROPERTY

Office supplies, telephone service, plumbing supplies, appliances for apartment units, electrical supplies, light fixtures, lawn maintenance, snow removal, painting services, and asphalt sealing for parking lots

---

[4] MCL 208.3(2); MSA 7.558(3)(2), defines "business activity" as a transfer of legal or equitable title to or rental of property, whether real, personal, or mixed, tangible or intangible, or the performance of services, or a combination thereof, made or engaged in, or caused to be made or engaged in, within this state, whether in intrastate, interstate, or foreign commerce, with the object of gain, benefit, or advantage, whether direct or indirect, to the taxpayer or to others, but shall not include the services rendered by an employee to his employer, services as a director of a corporation, or a casual transaction. Although an activity of a taxpayer may be incidental to another or other of his business activities, each activity shall be considered to be business engaged in within the meaning of this act.

were all among the types of goods and services for which PM One made the payments in question. The record is clear that none of the goods and services constituted PM One's inventory or stock in trade and that PM One did not, itself, acquire any of the goods and services to resell to clients.[5] PM One also asserts, apparently without challenge from the department, that it obtained the goods and services in the name, and for the benefit, of its clients and their respective properties. Simply put, then, PM One did not acquire either title to or possession of the goods and services the department identified even though PM One issued the checks for the goods and services. The conditions identified in part 2(a) of the above diagram, therefore, do not apply. Accordingly, because part 2(c) of the diagram inherently relies on a transaction that fits to some extent within the definition of transaction in part 2(a), it does not apply in this case.

#### IV. CONSIDERATION FOR SERVICES THAT CONSTITUTE BUSINESS ACTIVITIES

#### A. THE DEPOSITORY ACCOUNTS AND THE CDA

Whether, by issuing checks for the goods and services in question, PM One engaged in the "performance" of "services" constituting "business activities," part 2(b) of the above diagram, is a more difficult

---

[5] Indeed, PM One asserts it obtained no benefit from any rebates or discounts the vendors made available, it did not mark up any of the goods and services, and it did not "warehouse" any goods or convert them to its own separate use.

puzzle to solve. However, PM One's ordinary business dealings with its clients and the way it pays for goods and services for its clients with client funds by using the CDA are quite telling.

According to PM One, its personnel collected rents for its clients at each client's separate property or properties. PM One then deposited the rents it collected into a separate depository account maintained for each client in each client's name. To pay for goods and services with client funds, PM One engaged in a two-step process. First, it transferred money out of an individual client's depository account and *into* the CDA. Next, it drew money *from* the CDA in the form of checks made payable to the relevant third-party vendor. PM One claims that when it wrote checks *from* the CDA, the checks were for the precise amount necessary to pay for the goods and services, exactly equal to the amount it transfers from the individual client's depository accounts *into* the CDA. The CDA was, therefore, a "zero balance account," meaning that all funds that flowed into the account immediately flowed out, so no money remained in it and no interest accrued.

Generally speaking, PM One used the CDA to make three separate types of payments: (1) payments from the CDA to PM One for its management fees, (2) payments from the CDA to PM One as reimbursement for the costs of PM One's personnel, such as site managers, leasing agents, or maintenance staff assigned to its clients' properties, and (3) payments from the CDA to third-party vendors who provide goods and services to each client's property. It is the third category that is critical; the department did not challenge PM One's claim that it included its management fees, cat-

egory one, and reimbursement for personnel expenses, category two, when calculating its gross receipts and paying the corresponding SBT. With respect to category three, PM One admitted that it did not consider the money that flowed through the CDA to third-party vendors when calculating its SBT for the relevant tax years. Consequently, out of the three categories of payments PM One made using the CDA, the parties only dispute whether SBT was payable for this third category of transactions.

As noted above, to pay third-party vendors, PM One used a two-step process of transferring money into and out of the CDA. Despite the Michigan Tax Tribunal's conclusion that the money flowing through the CDA to third-party vendors constituted consideration to PM One in the form of reimbursement, the record commands a contrary inference. In short, as discussed in more detail below, these transactions cannot be considered PM One's "sales," MCL 208.7(1); MSA 7.558(7)(1), because PM One neither provided the disputed goods and services nor received or otherwise owned the consideration that flowed through the CDA from the individual client's depository account to the third-party vendors.

B. THE FLOW OF FUNDS INTO THE CDA

Focusing on the first step, transferring money into the CDA, the record does not make clear that this money belonged to PM One either in the individual client's depository account from which it originated or while in the CDA for that brief and almost theoretical moment before being transferred to a third party.

For instance, the depository accounts were not only separated for each client, but also kept in each client's name. This supports the testimony of PM One's president that PM One did not have any right or title to the money in those individual accounts, regardless of how the funds were routed to the third-party vendors.

PM One's president also stated that none of the funds in the CDA belonged to PM One. That none of PM One's clients had access to the CDA, which PM One exclusively managed, does not undermine the notion that the funds in the CDA belonged to the client. As a zero-balance account, there would have been no practical way for clients to manage or even access the money in the CDA because the payments to third-party vendors *out of* the account were practically instantaneous, virtually coinciding with the moment of a deposit *into* the CDA. Further, funds released into the CDA had been designated to pay for certain goods and services, suggesting that the clients would have no reason to attempt to manage funds in the CDA as if it were a standard depository account, even if it were possible to do so.

Critically, although they resided only very briefly in the CDA, from which PM One has authority to draw checks, the funds continued to belong to the client at this stage. PM One did not have any access to the money in the sense that it could use the funds in the CDA in a manner it chose or to benefit itself as a business might ordinarily use the consideration it earned from conducting business. See MCL 208.7(3); MSA 7.558(7)(3) (agency exception to gross receipts). This accords with the common understanding that an agent may work on behalf of a principal within the

scope of the agency agreement as if the agent had stepped into the shoes of the principal without incurring any personal liability. See *Brusslan v Larsen*, 6 Mich App 680, 686; 150 NW2d 525 (1967). Thus, there is no evidence that funds flowing into the CDA constituted consideration *to or from* PM One because PM One had no personal right to the money, even if the underlying transaction between the client and the third-party vendor constituted a sale within the meaning of MCL 208.7(1); MSA 7.558(7)(1).

## C. THE FLOW OF FUNDS OUT OF THE CDA

There is even less evidence that funds flowing out of the CDA constituted consideration *to or from* PM One for "the performance of services." MCL 208.7(1); MSA 7.558(7)(1); see also MCL 208.3(2); MSA 7.558(3)(2). The vendors, not PM One, actually performed the services and business activities for which the clients were paying. Moreover, the vendors, not PM One, actually received the payments from the CDA; if PM One received a check drawn on the CDA for services or reimbursement, it paid the SBT on those funds. PM One's accounting witness likened this arrangement to the way a "common paymaster" disburses an employer's funds to employees; the employer's funds would not be considered the paymaster's gross receipts simply because the paymaster disbursed them. Quite clearly, then, the vendor, not PM One, performed the "services" that were "business activities" within the meaning of a "sale" under the SBTA, making the receipt of those funds taxable to the vendors, not PM One. We conclude that the chal-

lenged transactions were not "sales" as defined in
MCL 208.7(1); MSA 7.558(7)(1).

### V. GROSS RECEIPTS

#### A. STATUTORY PROVISIONS

As noted above, gross receipts are "the sum of
sales" and "rental or lease receipts." MCL 208.7(3);
MSA 7.558(7)(3). Rental and lease receipts are not at
issue here and, even assuming that the act of transfer-
ring money into and out of the CDA constituted "sales"
within the meaning of MCL 208.7(1); MSA
7.558(7)(1), contrary to the foregoing analysis, the
agency exclusion in MCL 208.7(3); MSA 7.558(7)(3)
eliminated the SBT for those transfers.

#### B. THE AGENCY EXCLUSION AND REIMBURSEMENT

Gross receipts do not "include the amounts received
in an agency or other representative capacity, *solely
on behalf of another or others* . . . ." MCL 208.7(3);
MSA 7.558(7)(3) (emphasis supplied). But gross
receipts do include

> amounts received by persons having the power or authority
> to expend or otherwise appropriate such amounts *in pay-
> ment for or in consideration of sales or services made or
> rendered by themselves or by others acting under their
> direction and control* or by such fiduciaries as guardians,
> executors, administrators, receivers, conservators, or trust-
> ees other than trustees of taxes received or collected from
> others under the direction of the laws of the federal govern-
> ment or of any state or local governments." [*Id.* (emphasis
> supplied).]

As a result, the plain language of MCL 208.7(3); MSA
7.558(7)(3) protects agents from paying SBT for their

principal's gross receipts and ensures that a principal will not avoid the SBT by channeling its gross receipts through an agent.

Despite the clear language, the Michigan Tax Tribunal stated that the agency

> exclusion . . . does not apply to the amounts at issue because Petitioner [PM One] does not receive such amounts *solely on behalf of another*; instead, Petitioner has the power or authority to expend or otherwise appropriate such amounts in payment for or in consideration of sales or services made or rendered by it *or by others acting under its direction or control.* [Emphasis supplied.]

However, as we discussed in the context of "sales," the evidence on the record strongly supports the conclusion that to the extent that PM One might ever have "received" money that flowed into the CDA, it did so solely on behalf of its clients because of an express agency relationship. Accordingly, we conclude that the agency exclusion applies in this case.

However, there is an *exception* to the agency exclusion, and the only reason that the agency exclusion would not apply to the challenged transactions is if that *exception* operated here. As MCL 208.7(3); MSA 7.558(7)(3) says, the agency exclusion does not apply to "payment for or in consideration of sales or services made or rendered by [the taxpayer] or by others acting under their direction and control . . . ." The critical term the Michigan Tax Tribunal emphasized in its decision was "direction and control." Although case law does not define what constitutes "direction and control" in MCL 208.7(3); MSA 7.558(7)(3), the phrase bears a marked similarity to analyses in other contexts that attempt to distinguish between an employee and an independent contractor. For

instance, in *Hoffman v JDM Associates, Inc*, 213 Mich App 466, 468-469; 540 NW2d 689 (1995), this Court stated that an employer is only vicariously liable for the acts of an employee when the employee remains under the employer's "direction and control." Quoting *Janik v Ford Motor Co*, 180 Mich 557, 562; 147 NW 510 (1914), this Court explained:

> "It is not so much the actual exercise of control which is regarded, as the right to exercise such control. To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under control of a third person. Subject to these rules the original master is not liable for injuries resulting from acts of the servant while under the control of a third person." [*Hoffman, supra* at 469.]

Similarly, in the worker's compensation context, the courts must determine if a plaintiff was an "employee" before determining if the plaintiff was improperly denied benefits. See *Oxley v Dep't of Military Affairs*, 460 Mich 536, 549; 597 NW2d 89 (1999). To do so, courts apply the economic-reality test, which examines a number of criteria to determine whether the employer had control over the employee, including whether the employer paid the employee's wages, hired, fired, or had the capacity to discipline the employee, and whether the employer and employee had a common purpose. The factors are viewed together in their entirety under a totality of the circumstances test. *Id.*, citing *Kidder v Miller-Davis Co*, 455 Mich 25, 34; 564 NW2d 872 (1997).

True, MCL 208.7(3); MSA 7.558(7)(3) does not, on its face, require the meaning of "direction and control" to be the same in the tax context as in employment-related cases. Indeed, whether an individual is

an "employee" might require a greater measure of "direction and control" than the Legislature intended to impose when determining SBT liability. However, these other contexts provide good examples of individual factors that might constitute "direction and control" here.

With these examples in mind, it is difficult to conceive of, for example, a representative of the telephone company being under PM One's "direction and control" when fulfilling a request to activate telephone service to an apartment unit. Similarly, it is unlikely that the employees of separate businesses who perform landscaping services, snow removal, or paint an apartment building were under PM One's "direction and control." PM One could not hire, fire, or discipline any of these individuals. Nor did any of these individuals fully relinquish their position of employee for the third-party vendor when performing work for PM One's clients. Further, there is no evidence whatsoever that PM One rendered the services corresponding to the challenged transactions through the CDA "itself" by using its own personnel to perform services or by selling its own stock, inventory, or property. Therefore, there was no factual basis for the Michigan Tax Tribunal's conclusion that the exception to the agency exclusion applies in this case.

C. CASES INTERPRETING REIMBURSEMENT IN THE GROSS RECEIPT
CONTEXT

Not only does the plain language of MCL 208.7(3); MSA 7.558(7)(3) mandate this conclusion, so, too, does the case law construing that statute. These cases do not provide any meaningful construction of the SBTA that would convert the challenged transactions

through the CDA into taxable reimbursement to PM
One.

### (1) STRATTON-CHEESEMAN

In *Stratton-Cheeseman Management Co v Dep't of
Treasury*, 159 Mich App 719, 721; 407 NW2d 398
(1987), the plaintiff corporation managed the Michigan
Physicians Mutual Liability Company pursuant to
a written agreement, which required Stratton-
Cheeseman to issue policies, collect premiums,
administer claims, and do a variety of other tasks. In
return for discharging these responsibilities, the plaintiff
corporation received a flat fee calculated in relation
to the number of policyholders. *Id.* at 722. Under
the terms of this agreement, the plaintiff corporation
would also pay for certain expenses on behalf of the
insurance company, which the insurance company
would repay to the plaintiff corporation. *Id.* The
plaintiff corporation claimed that it was liable for SBT
only with regard to the flat fee it received and not
this second type of income that came from reimbursements
for its cost of doing business. *Id.* Asked
to determine whether the reimbursement arrangement
fit within the agency exclusion in MCL 208.7(3);
MSA 7.558(7)(3), this Court stated:

> [W]e are of the opinion that when plaintiff received and
> deposited into bank accounts designated by the insurance
> company premiums and other monies it was acting as an
> agent; these funds were intended by the Legislature to be
> excluded from the meaning of gross receipts in § 7(3) of the
> SBTA. However, the payments received by plaintiff as reimbursement
> for costs incurred in managing the insurance
> company's business clearly were not. Plaintiff did not
> receive this money from the insurance company as a repre-

sentative of the insurance company. Instead, the substance of the reimbursement payments for tax purposes was to compensate plaintiff for services provided in managing the insurance company's business. The fact that the insurance company reserved the right to approve costs prior to making payments and required plaintiff to operate within an approved budget does not alter this conclusion. In this regard, the insurance company's right to approve the amount of reasonable costs subject to reimbursement must be distinguished from plaintiff's right to authorize the actual expenditures. Plaintiff's contention that the insurance company "retained control" over costs fails to make this distinction.

As the department correctly contends, to accept plaintiff's theory would result in only the monthly fees received by plaintiff, which are computed based on a fixed rate per policyholder, being subject to the tax. Since the monthly fees essentially represent gross profits above and beyond plaintiff's costs, the purpose of the SBTA to impose a tax on the value of business activity, and not its income, would be defeated. [*Stratton-Cheeseman, supra* at 727-728.]

In this case we address a problem inverse to the one that *Stratton-Cheeseman* describes. PM One is *not* attempting to avoid paying SBT on the money that passes through the CDA to reimburse it for the expenses it pays for with its own money or for its personnel expenses. *Stratton-Cheeseman* clearly requires PM One to incorporate those gross receipts when calculating its SBT, and it does so. Rather, the transactions that the department is attempting to tax are analogous to the transactions this Court *protected* from the SBT in *Stratton-Cheeseman* under the agency relationship between the plaintiff corporation and the Michigan Physicians Mutual Liability Company. Quite clearly, in *Stratton-Cheeseman* this Court concluded that managing and transferring money on behalf of a client could fit within the agency exclusion as long as

the agent is not reimbursed for expenses associated with those activities and as long as it pays SBT on a separate fee agreement that contemplates, or otherwise accounts for, the costs of those services, whether designated as costs or profits. *Id.* at 727. This rule applies no differently here. Because PM One accounted for the costs of maintaining the CDA in its separate fee agreements with its clients and it paid SBT on those fee agreements, the agency exclusion protects it from tax liability for the funds that pass through the CDA to third-party vendors. These vendors are, in reality, very similar to the claimants that the plaintiff corporation in *Stratton-Cheeseman* paid on behalf of the Michigan Physicians Mutual Liability Company with the money it managed for that principal.

Furthermore, PM One was not attempting merely to pay SBT on its gross profits instead of the value of the business it conducted. *Id.* at 728. Unlike the plaintiff corporation in *Stratton-Cheeseman,* PM One's agreements with its clients included payments for both costs and profit. Thus, we conclude that allowing PM One to avoid paying SBT on these transactions through the CDA in which the third-party vendors actually receive payment is *not* tantamount to allowing PM One to evade paying its fair share under the SBTA.

### (2) *APCOA*

This Court again addressed the agency exclusion to gross receipts in *APCOA, Inc v Dep't of Treasury*, 212 Mich App 114; 536 NW2d 785 (1995). APCOA operated parking structures at the Detroit Metropolitan Airport and in the city of Flint. *Id.* at 115. Just as with the plaintiff corporation in *Stratton-Cheeseman,*

*supra*, and unlike PM One here, APCOA entered into a "cost-plus" agreement with its clients. *Id.* at 116. APCOA received not only a percentage of the revenues from the parking structures as its "management fee," its clients also reimbursed it "for all of its direct operating expenses, such as payroll and insurance payments." *Id.* Citing *Stratton-Cheeseman*, this Court stated that "monies received by a management agent as reimbursement of expenses are properly included in the calculation of the management agent's single business tax liability." *Id.* at 118. *APCOA*, therefore, does nothing more than *Stratton-Cheeseman* would do in terms of defining the circumstances under which an agent is liable for SBT. ·

Here, *APCOA* does not support the Michigan Tax Tribunal's decision because the challenged consideration flowing through the CDA was not for services PM One rendered for its clients, nor did it ultimately go to PM One. Unlike the arrangement between APCOA and its municipal clients, PM One incorporated most of its expenses into a single fee agreement or reimbursement arrangements for which it voluntarily paid the SBT. Evidently, the very purpose of PM One's arrangement with its clients was to avoid expending its own money on behalf of the client and then being forced to wait for reimbursement. Using the CDA to track and disburse client funds was a way to put that arrangement into action with minimal paperwork and effort. That this arrangement avoids the tax liability imposed on the very dissimilar reimbursement system in *APCOA* and *Stratton-Cheeseman* clearly is not sufficient reason alone to impose the SBT.

(3) *CREDIT ACCEPTANCE*

The most recent case addressing the concept of taxable reimbursement under the SBTA is *Credit Acceptance Corp v Dep't of Treasury*, 236 Mich App 478; 601 NW2d 109 (1999). Credit Acceptance Corporation acted as an agent for automobile dealerships when collecting money customers owed under installment contracts and received twenty percent of the money it collected after deducting collection costs as a "servicing fee." *Id.* at 480. When a customer could not pay under the installment contract, the dealer authorized Credit Acceptance Corporation to incur reasonable expenses in repossessing the automobile, for which Credit Acceptance Corporation reimbursed *itself*, because the dealer then transferred the sales contract into Credit Acceptance Corporation's name. *Id.* This Court considered whether this reimbursement scheme for repossession costs constituted gross receipts under the SBTA, concluding that this arrangement constituted consideration for the performance of personal services under MCL 208.7(1); MSA 7.558(7)(1), a sale under part 2(b) in the diagram above. *Credit Acceptance, supra* at 480-482. Further, the Court concluded that the agency exclusion in MCL 208.7(3); MSA 7.558(7)(3) did not apply because any sums Credit Acceptance Corporation collected once the sales contract was in its name went directly to it, and was not shared with the dealer. *Credit Acceptance, supra* at 480-482. Therefore, Credit Acceptance Corporation was not acting as an agent for the dealer when it incurred and "reimbursed" itself for these expenses. *Id.*

Although concurring with the majority's opinion, Judge MARKMAN[6] wrote separately to explore the relationship between Credit Acceptance Corporation and the automobile dealers more fully. *Id.* at 483. Relying on both *Stratton-Cheeseman* and *APCOA*, he summarized the critical issue as whether the "reimbursed expenses were used in the generation of the management fees. If indeed the expenses were used to generate the management fees, then their reimbursement would not occur 'solely in an agency capacity.' " *Id.* at 488. Judge MARKMAN concluded that, if a customer defaulted on a sale contract, Credit Acceptance Corporation would not earn any other fee unless it incurred these reimbursable fees. *Id.* at 489. In other words, when repossessing an automobile, Credit Acceptance Corporation *only* earned money by incurring costs. Consequently, Judge MARKMAN determined that "because these repossession costs do aid in the generation of a portion of [Credit Acceptance Corporation's] gross profits, they are not incurred 'solely on behalf of another' " and were subject to the SBT. *Id.*

Applying either the majority's looser formulation of the agency exclusion or Judge MARKMAN's more precise blueprint in *Credit Acceptance* leads to the same result—that the challenged transactions are not part of PM One's gross receipts—for two reasons. First, there was no "sale" here because the disputed transactions do not involve any "business activity" by PM One. Second, even if there were a "sale," there is no evidence that the funds that flowed through the CDA to other vendors figured into the consideration for PM One's management services at all. PM One does

---

[6] Now Justice MARKMAN.

not earn interest from the CDA. PM One's management fee rests on variables unrelated to the money in the CDA. PM One does not charge any sort of separate fee for maintaining the CDA, nor does the standard agreement with its clients provide that clients will reimburse PM One for any expenses it might incur by using the CDA. These factors all lead to the conclusion that PM One maintained the CDA solely on behalf of its clients and that the agency exclusion operates here to absolve it of SBT liability for the transactions directing money to third-party vendors.

### D. THE INDIRECT PAYMENT THEORY

The department's theory that the SBT should apply to the challenged transactions because they passed through the CDA and added value to its business by allowing PM One to perform its management obligations under its contracts with its clients has no appreciable merit. While it is true that PM One had a general obligation to keep the properties in good repair and that well-maintained properties often are more marketable, the individual clients compensated PM One by paying the management fees and reimbursing its personnel expenses. PM One included these two forms of compensation within its calculation of its gross receipts and paid the appropriate SBT on them; they are not at issue here.

More importantly, *every* time an agent performs contractual obligations the agent is ultimately working toward earning its management fee and thus benefits from being able to carry out the terms of an agency agreement. Yet, the department's auditors excluded mortgage payments and property taxes clients paid through the CDA when calculating PM One's

gross receipts because the auditors determined that these payments "carried with the property." In terms of fulfilling its obligations under the agency agreements, there is no relevant distinction between PM One's obligation to pay these taxes on behalf of its clients, which the department determined not to be taxable, and paying the third-party vendors, which the department determined to be taxable. Both types of payments helped PM One perform its obligations and enhanced the value of the services it offered its clients. Thus, the department's decision to designate only payments to third-party vendors as gross receipts was not well grounded in reality.

Nor is there a textual basis in *Credit Acceptance Corp, supra,* to suggest that performing any and all duties related to a principal's expenditures for goods and services provided by third-party vendors brings those expenditures within the definition of gross receipts under the SBTA. To the contrary, both the majority and the concurrence in *Credit Acceptance Corp* required the taxed activity to generate fees or lead to reimbursement in and of itself, irrespective of any separate agreement. Managing the CDA and drawing on it to pay third-party vendors did not, in and of itself, affect PM One's compensation for its work as an agent in any manner, whether directly or indirectly. Accordingly, *Credit Acceptance Corp* does not permit taxation of these activities.

To hold otherwise in this case would completely obviate the agency exclusion to the definition of gross receipts, MCL 208.7(3); MSA 7.558(7)(3). Under the indirect theory of compensation that the department advances, no agent could avoid paying SBT on a "business activity" performed for a principal, no mat-

ter how strictly and obviously that activity was "solely for the benefit of another or others" because it would always be furthering the agent's financial interest under the agency agreement. *Id.* Our bedrock rules of statutory construction prohibit this result, saying that the courts must apply unambiguous statutes as written, construe them reasonably when necessary, and make every reasonable effort to give meaning to *all* the words in the statute to avoid nullifying the Legislature's intent. See *State Treasurer v Schuster*, 456 Mich 408, 417; 572 NW2d 628 (1998); *Helder v North Pointe Ins Co*, 234 Mich App 500, 504; 595 NW2d 157 (1999).

### VI. CONCLUSION

We conclude that the payments in question here did not constitute a "sale" by PM One within the meaning of MCL 208.7(1); MSA 7.558(7)(1). Even if the payments were "sales," we conclude that the agency exclusion in the definition of "gross receipts," MCL 208.7(3); MSA 7.558(7)(3), bars this tax liability because the payments were neither reimbursements to PM One nor indirect payments for management services that PM One provided to its individual clients. That the payments in question passed through the CDA, which PM One managed, did not alter their essential character. If the SBT is a tax on "economic activity and growth" as measured by "the increase in value of goods and services brought about by whatever is done to them between the time of purchase and sale," *ACCO Industries, Inc v Dep't of Treasury*, 134 Mich App 316, 318; 350 NW2d 874 (1984), then PM One simply did not bring about an increase in the value of goods and services that the

third-party vendors provided. The payments were therefore not properly included in PM One's gross receipts. We therefore reverse the decision of the Tax Tribunal.

Reversed.

Sawyer, P.J., concurred.

Hood, J. (*dissenting*). I must respectfully dissent, because I do not believe that the record supports the conclusion reached by the majority.

Petitioner contended that the central depository account merely served as the means for handling the client's financial affairs. Therefore contends the petitioner, the Tax Tribunal's determination that payments for goods and services made on behalf of its clients constituted gross receipts was an error at law. Unlike the majority, I disagree. Absent fraud, this Court's review of a decision by the Michigan Tax Tribunal is limited to determining whether the tribunal made an error of law or applied a wrong legal principle. *Sandy Pines Wilderness Trails, Inc v Salem Twp*, 232 Mich App 1, 9; 591 NW2d 658 (1998). Factual findings by the tribunal are upheld unless they are not supported by competent, material, and substantial evidence. *Georgetown Place Cooperative v City of Taylor*, 226 Mich App 33, 43; 572 NW2d 232 (1997). The failure of the tribunal to base its decision on competent, material, and substantial evidence is an error of law requiring reversal. *Id.* I believe that the majority opinion departs from this basic premise.

MCL 208.7; MSA 7.558(7) defines "sales" and "gross receipts" for purposes of the single business tax as follows:

(1) "Sale" or "sales" means the gross receipts arising from a transaction or transactions in which gross receipts constitute consideration: . . . (b) for the performance of services, which constitute business activities . . . .

\*          \*          \*

(3) "Gross receipts" means the sum of sales, as defined in subsection (1), and rental or lease receipts. Gross receipts does not include the amounts received in an agency or other representative capacity, solely on behalf of another or others but not including amounts received by persons having the power or authority to expend or otherwise appropriate such amounts in payment for or in consideration of sales or services made or rendered by themselves or by others acting under their direction and control . . . .

In *Stratton-Cheeseman Management Co v Dep't of Treasury*, 159 Mich App 719, 721; 407 NW2d 398 (1987), the plaintiff managed a medical insurance company. The plaintiff's responsibilities included processing insurance applications, issuing policies, collecting premiums, administering claims, and maintaining records and reports. The plaintiff was obligated to abide by the insurance company's operating budget and could not expend amounts in excess of a set budget unless approval was obtained from the company's board of directors. *Id.* at 721-722.

The plaintiff was compensated by a monthly fee based on the number of policyholders and was reimbursed reasonable costs incurred on the insurance company's behalf, including, but not limited to, the plaintiff's salaries, wages, outside contractual services, and allocated overhead. The plaintiff included its fee and sums received as reimbursement for expenditures as gross receipts when filing its tax returns, but later sought a refund, claiming that reim-

bursed expenditures were not subject to tax as gross receipts. This Court concluded that the amounts characterized as reimbursements were properly included as gross receipts:

> We find no ambiguity in the meaning of gross receipts as defined by the SBTA [Single Business Tax Act]. The definition clearly excludes from gross receipts the amount received by a taxpayer solely in an agency or representative capacity, while including amounts received as consideration for the performance of personal services. . . .
>
> We turn, then, to the question of whether plaintiff's reimbursement payments under the services agreement fit within the clear statutory definition of gross receipts. It is the substance of a transaction rather than the terms applied by the parties which determines how to characterize the payment for tax purposes. In a multiparty transaction, this Court should honor the allocation of rights and duties effected by the parties in an agreement, when supported by tax-independent considerations. [*Id.* at 725 (citations omitted).]

This Court went on to examine the nature of the agency relationship between the plaintiff and the insurance company and concluded:

> Mindful of these definitions, we are of the opinion that when plaintiff received and deposited into bank accounts designated by the insurance company premiums and other monies it was acting as an agent; these funds were intended by the Legislature to be excluded from the meaning of gross receipts in § 7(3) of the SBTA. However, the payments received by plaintiff as reimbursement for costs incurred in managing the insurance company's business clearly were not. Plaintiff did not receive this money from the insurance company as a representative of the insurance company. Instead, the substance of the reimbursement payments for tax purposes was to compensate plaintiff for services provided in managing the insurance company's business. The

fact that the insurance company reserved the right to approve costs prior to making payments and required plaintiff to operate within an approved budget does not alter this conclusion. In this regard, the insurance company's right to approve the amount of reasonable costs subject to reimbursement must be distinguished from plaintiff's right to authorize the actual expenditures. Plaintiff's contention that the insurance company "retained control" over costs fails to make this distinction. [*Id.* at 727.]

Furthermore, in *APCOA, Inc v Dep't of Treasury*, 212 Mich App 114, 115-116; 536 NW2d 785 (1995), the petitioner operated parking structures on behalf of Wayne County. Wayne County retained control in the form of staff hiring, parking rates, and control systems. The petitioner received a management fee based on a percentage of the gross parking revenues and was reimbursed for all its direct operating expenses, including payroll and insurance payments. The petitioner initially included reimbursement for operating expenses in paying the single business tax, but later sought a refund for those expenses. This Court held that "monies received by a management agent as reimbursement of expenses are properly included in the calculation of the management agent's single business tax liability." *Id.* at 118, citing *Stratton-Cheeseman, supra*. Finally, in *Credit Acceptance Corp v Dep't of Treasury*, 236 Mich App 478, 481-482; 601 NW2d 109 (1999), this Court concluded that reimbursement to the petitioner for the costs of repossession of automobiles constituted gross receipts for purposes of MCL 208.7; MSA 7.558(7). Unlike the majority, I do find that these cases are readily distinguishable from the situation under consideration here.

In the present case, petitioner argues that its management agreement defined its relationship with its clients as one of agency and that it acted as an agent by merely funneling payments for goods and services received for the benefit of the client. I disagree. While petitioner did, in fact, characterize its relationship with its clients as one of agency, the substance of the parties' transaction, not the terms employed, determines how to characterize the payment for tax purposes. *Stratton-Cheeseman, supra.* Furthermore, even if petitioner were deemed an agent, the costs incurred in managing the properties must be received solely on behalf of the client. *Id.*; MCL 208.7; MSA 7.558(7). While petitioner did manage the properties under the authority of the client, petitioner was afforded discretion in its operation of the properties. Petitioner's president, Michael McGhie, and chairperson, Robert Pendergast, testified that client approval had to be obtained for some purchases in excess of a particular dollar amount. However, it was also petitioner's responsibility to lease the rental properties of its clients and take action to fulfill its obligations. Accordingly, petitioner could advertise in an attempt to lease the properties or engage in beautification projects, such as purchasing an aquarium, to make the property more attractive to potential tenants. In essence, the substance of the reimbursement payments for tax purposes was to compensate petitioner for services provided in managing the properties. *Stratton-Cheeseman, supra.* Petitioner's services also fulfilled its own business goals to the extent that it increased property rentals, and, in turn, the management fee received by petitioner. Furthermore, McGhie testified that in contracting with rental property cli-

ents, he will "undertake to keep it [the property] in good repair." The monetary transfer by petitioner from the central depository account was not merely a funneling of funds from the client to a third-party vendor with petitioner acting as the intermediary, but rather evidenced payment for goods and services for the client's interest that also discharged petitioner's obligations under the management agreements. Thus, it is not clear from the record, as the majority asserts, that none of the goods and services constituted petitioner's inventory or stock in trade. Accordingly, the "reimbursements" for expenses incurred was appropriately included as gross receipts for purposes of the single business tax. MCL 208.7; MSA 7.558(7); *Stratton-Cheeseman, supra; APCOA, supra.*

I do not find that the Michigan Tax Tribunal made an error of law or applied a wrong legal principle, or that its factual findings are not supported by competent, material, or substantial evidence. Therefore, I would affirm.