GEORGETOWN PLACE COOPERATIVE v CITY OF TAYLOR

Docket No. 186714. Submitted January 15, 1997, at Detroit. Decided October 17, 1997, at 9:10 A.M.

Georgetown Place Cooperative, a federally subsidized housing cooperative in the City of Taylor and Wayne County, established pursuant to the provisions of § 221(d)(3) of the National Housing Act, 12 USC 1715l(d)(3), challenged in the Tax Tribunal the assessed value of its property for the tax years 1984 through 1994. The Tax Tribunal determined that the petitioner failed to carry its burden of proof with respect to establishing the true cash value of the property. Recognizing its obligation to determine the most useful approaches for providing the most accurate valuation, the tribunal was persuaded by the respondent's market approach based on the sales of federally subsidized housing in the same geographic area as the petitioner's cooperative. The tribunal further found that it was necessary to adjust the resulting value to account for a lack of marketability and was persuaded by the method used in an appraisal submitted by the respondents, which was prepared by a certified real estate appraiser, to calculate a thirty percent discount rate. Unlike the appraiser, who estimated that a discount of thirty percent of the equity portion of the property value was an appropriate adjustment for the lack of marketability associated with a subsidized or regulated cooperative, the tribunal applied the discount rate to the entire value and determined the true cash value of the property for the years in question. The assessed value for each tax year was fifty percent of the true cash value of the property. The petitioner appealed from the judgment and order of the tribunal.

The Court of Appeals *held*:

1. The tribunal did not err in declining to adopt the "cooperative approach" for determining true cash value advanced by the petitioner's appraisers. Those appraisers determined the highest and best use of the property was a § 221(d)(3) cooperative, and, recognizing the restrictions placed on the property by the regulatory agreement, calculated the value of the property using the income approach, cost approach, and a market sales comparison approach. The cooperative approach is a flawed method for determining the value of § 221(d)(3) cooperatives. The approach involves the calcu-

lation of a mortgage component by determining the present value of a mortgage in the commercial paper market. Because the income received by a holder of a note with a higher interest rate is greater than that received by the holder of a note with a lower interest rate, the present value of the income stream is greater. As a result, property encumbered by a mortgage with a higher interest rate will have a greater value than identical property encumbered by a mortgage with a lower interest rate. Thus, the approach violates the principle of uniformity in real property taxation because it results in disparate estimates of the value of identical properties built under different market conditions.

2. The tribunal properly used a market sales comparison approach to determine the value of the property. There is no single correct approach to valuing federally subsidized real property. An approach is acceptable if it is demonstrated to be accurate and reasonably related to the fair market value of the subject property. The final estimate of true cash value must represent the physical real estate and all the interests, benefits, and rights inherent in the ownership of the subject real property.

3. The tribunal did not err in using certain studies concerning the estimation of discounts for lack of marketability in determining the appropriate discount to be applied in this case. The tribunal properly considered the traditional approaches to valuation and applied a discount rate to the value derived from a sales comparison approach in order to account for the restrictions placed on the property.

4. The tribunal did not err in allowing the respondents to cure the default that was entered when they did not file their appraisal in a timely manner. Even if the respondent's failed to show good cause for the failure to file the appraisal in a timely manner, the petitioner was not prejudiced by the error. Reversal is not required because of the admission of the respondents' appraisal and testimony by the appraiser.

5. The tribunal did not err in allowing the respondents to amend their appraisal at the tribunal hearing or in ordering that the studies and articles relied on by the respondents' appraiser in determining the discount rate used in his valuation approach be submitted after the hearing.

Affirmed.

1. TAXATION — VALUATION — FAIR MARKET VALUE — BURDEN OF PROOF.

A taxpayer bears the burden of proof with respect to the true cash value of the taxpayer's property; true cash value is synonymous with fair market value and is commonly determined by three different approaches: cost less depreciation, sales comparison, and capi-

talization of income; other approaches may be used if they are accurate and reasonably related to the fair market value of the property; regardless of the approach used, the value determined must represent the usual selling price for the property (MCL 205.737[3]; MSA 7.650[37][3]).

2. TAXATION — VALUATION — FEDERALLY SUBSIDIZED REAL PROPERTY.

The use of the cooperative approach to valuation is not appropriate in determining the true cash value of a housing cooperative established pursuant to the provisions of § 221(d)(3) of the National Housing Act, 12 USC 1715l(d)(3); while there is no single correct approach for valuing federally subsidized real property, the approach utilized must be demonstrated to be accurate and reasonably related to the fair market value of the property; the final estimate of true cash value must represent the physical real estate and all the interests, benefits, and rights inherent in the ownership of the subject real property; the approach used must not violate the principle of uniformity in real property taxation.

3. TAXATION — TAX TRIBUNAL — DEFAULTS.

A party to an action in the Tax Tribunal may be held in default where the party fails to proceed as required by the tribunal or the tribunal's rules; the default may be set aside for reasons the tribunal deems sufficient upon motion made within twenty days of the entry of the order of default (1979 AC, R 205.1247[4]).

4. TAXATION — TAX TRIBUNAL — EVIDENCE.

With the permission of the Tax Tribunal and upon a showing of good cause, a witness may testify and the witness' appraisal may be admitted even though the appraisal was not supplied to the opposing party on time; while it is error to admit a late appraisal if the party fails to offer a showing of good cause, reversal is not required on the basis of this error unless the opposing party demonstrates prejudice.

5. TAXATION — TAX TRIBUNAL — HEARINGS — EVIDENCE.

Hearings in the Tax Tribunal are conducted in accordance with the provisions of Chapter 4 of the Administrative Procedures Act; the parties must be given the opportunity to present evidence and arguments regarding issues of fact, cross-examine witnesses, and submit rebuttal evidence; the rules of evidence must be followed as far as practicable, but the tribunal may admit and give probative effect to evidence of a type commonly relied on by reasonably prudent men in the conduct of their affairs (MCL 24.271 *et seq.*, 205.726; MSA 3.560[171] *et seq.*, 7.650[26]).

*John S. Gilbreath, Jr.,* Corporate Counsel, Cocon, Inc., as Agent for the petitioner.

*Jennifer M. Granholm,* Corporation Counsel, and *Richard G. Stanley,* Assistant Corporation Counsel, for Wayne County.

*Mason, Steinhardt, Jacobs & Perlman, P.C.* (by *Walter B. Mason, Jr.*), for the City of Taylor.

Before: JANSEN, P.J., and YOUNG and R. I. COOPER\*, JJ.

YOUNG, J. Petitioner, a federally subsidized housing cooperative, appeals as of right from a judgment of the Tax Tribunal establishing the assessed value of petitioner's property for the tax years 1984 through 1994. We affirm.

I

Petitioner is a housing cooperative located on approximately twenty acres of land within the City of Taylor and Wayne County. The 194 housing units that make up the cooperative were constructed during 1965 and 1966 pursuant to the provisions of § 221(d)(3) of the National Housing Act, 12 USC 1715l(d)(3), a program that subsidizes low- and moderate-income housing by providing below-market interest rate financing and mortgage insurance. The developer of the project received a fee for services and transferred ownership to the cooperative upon completing construction. The cooperative is governed by a board of directors consisting of five of the members of the cooperative. In exchange for a forty-year

---

\* Circuit judge, sitting on the Court of Appeals by assignment.

mortgage with a three percent interest rate, the cooperative is subjected to regulations governing the income of its members and the monthly "carrying charges" paid by each member. The mortgage incorporates a regulatory agreement between the cooperative and the Department of Housing and Urban Development (HUD) that prohibits its sale, assignment, or prepayment during the forty-year term without prior written approval. The cooperative is required by regulation to keep a general operating reserve of at least twenty-five percent of its total expenses in order to cover any shortfall in monthly payments by members. A "replacement reserve" is also kept and, with the permission of HUD, it may be used to finance maintenance projects.

Each member of the cooperative must pay a monthly "carrying charge." The carrying charge is approved by HUD and is the member's share of the cooperative's total expenses. Every year, the members must certify their income, and if a member's income is greater than the limit imposed by HUD regulations, the member pays a ten percent surcharge in addition to the normal carrying charge. Upon selling a unit, the selling member receives the transfer value, i.e., the price of a share in the cooperative, which is set by the bylaws of the cooperative. On the date of trial, the transfer values were $3,175 for a one-bedroom unit, $3,880 for a two-bedroom unit, and $4,005 for a three-bedroom unit. A seller may also receive up to $500 for improvements made to the unit. Approximately a third of the members who sell their shares receive an average of $250 for improvements to their units.

At the tribunal hearing, petitioner presented an appraisal prepared by Terrell R. Oetzel and Jeffrey G. Genzink, certified real estate appraisers, and Oetzel testified about the method used therein. The appraisers determined that the highest and best use of the property was as a §221(d)(3) cooperative, and, recognizing the restrictions placed on the property by the regulatory agreement, calculated the value of the property using the income approach, cost approach, and a market sales comparison approach, commonly referred to as the "cooperative approach." Oetzel rejected both the income and cost approaches and relied solely on the third approach to valuation. Under the market sales comparison approach, the value of the property is equal to the sum of the value of membership shares, the present value of the debt each member assumes, and any cash reserve that transfers with the property. First, an equity component is calculated. Here, the equity, or transfer value, is set by the regulatory agreement and cooperative bylaws as the sum of the down payment made by the first occupant of the unit, the value of the occupancy agreement, the value of any improvements, and the value of any increase in these factors. Oetzel used the total of the transfer values, i.e., selling prices, as the equity component of value. Second, the cash equivalent value of the debt obligation, i.e., the mortgages, is calculated because it is considered to be the equivalent of an additional noncash portion of the total investment in the property. The value of the mortgages is a function of the total monthly payment, the remaining number of payments, and a yield rate derived from historical data and financial indicators for the tax years. In this case, Oetzel estimated that

the yield rate was 10.5 percent. Essentially, this factor is what a purchaser would have to pay the seller to enable him to pay off the obligation. Stated otherwise, it is the present value of a future stream of income equal to the payments due under the original mortgage, and it is thus a function of the market interest rate.

Finally, added to the equity and mortgage components is the present value of the cooperative's cash reserves and the value of the reversionary interest (the present value of the units when the regulations expire in 2007). The reversionary interest is calculated using the sales comparison approach. Oetzel reviewed the sales of eight comparable properties and determined that the value of the property was $4,850,000, or $25,000 for each unit. This value is essentially an estimate of what the property would be worth if there were no restrictions on its use and operation. Oetzel discounted the value by a factor that is a function of the remaining payments on the mortgage and a twenty percent yield rate that reflects the risk of possible changes in the marketplace and government regulations. Using this method, Oetzel opined that the market value of the property was $1,840,000 in 1984, $1,860,000 in 1985, $1,820,000 in 1986 and 1987, $1,930,000 in 1988 and 1989, $2,000,000 in 1990, $2,060,000 in 1991, $2,050,000 in 1992, $2,120,000 in 1993, and $2,180,000 in 1994.

Respondents submitted an appraisal prepared by Gerald Anderson, a certified real estate appraiser who also testified at the hearing in this matter. Anderson determined that the highest and best use of the property was its present use and calculated the value of the property using eight methods: (1) the cost

approach, valuing the property as private apartments; (2) the cost approach with adjustments for lack of marketability due to government regulations; (3) the sales comparison approach, using private housing as comparables, with and without adjustments for lack of marketability; (4) the sales comparison approach using subsidized housing as comparable properties; (5) the sales comparison approach using subsidized housing as comparable properties with adjustments for lack of marketability due to the restrictions placed on the cooperative; (6) the cooperative approach; (7) the assets listed in petitioner's financial statements; and (8) the value of the property listed in petitioner's Michigan Annual Reports. Anderson did not use the income approach because the cooperative is a nonprofit corporation that is prohibited from generating earnings and could not be sold or assigned for a profit-making use.

Upon review of all the appraisal methods, Anderson opined that the cost approach adjusted for a lack of marketability and the sales comparison approach using subsidized housing and adjusted for a lack of marketability were the most appropriate indicators of value. Under the cost approach, Anderson calculated the cost of developing the project in the tax years at issue by updating the reported cost of construction in 1965-66 using the comparative cost estimates contained in a publication of the Marshall Valuation Service. He then depreciated the building in accordance with the depreciation tables provided by the Marshall Valuation Service. Anderson also allowed for twenty percent economic or external obsolescence during the years 1983 to 1985 because rental rates were depressed in the private housing market and vacancy

rates were high. Because rental and occupancy rates increased in subsequent years, Anderson allowed for ten percent economic or external obsolescence during the years 1986-93. The resulting valuation was the value of the property for use as private housing.

An additional item of obsolescence was then included in order to calculate the value of the property as a cooperative. Relying on studies involving discounts to account for the lack of marketability associated with stock in closely held companies and restricted stock in publicly held companies, Anderson estimated that a discount of thirty percent of the equity portion (value minus debt) of the property value was an appropriate adjustment for the lack of marketability associated with a subsidized or regulated cooperative. Anderson explained that the discount rate was an average of the range of the results reported in the studies and that he only applied it to the equity portion of the value because a sale is actually a sale of equity, not debt. According to Anderson, the costs and benefits of the low-interest mortgage and the restrictions essentially balanced except for the marketability factor, a factor whose effect would decrease as the date on which the regulations are lifted grows closer.

Under the market sales comparison approach, Anderson reviewed twelve subsidized or government-assisted complexes sold between 1983 and 1986 in order to determine the average replacement cost for each unit for each tax year. Multiplying this amount by the number of units in petitioner's cooperative, he calculated the value of the property without any adjustment for the lack of marketability associated with the cooperative. Anderson then applied the

thirty percent discount rate in order to estimate the value of the property as subsidized and adjusted for a lack of marketability. Giving equal weight to the two approaches, he estimated that the value of the property was $3,570,000 in 1983, $3,606,000 in 1984, $3,659,000 in 1985, $3,939,000 in 1986, $4,044,000 in 1987, $4,090,000 in 1988, $4,089,000 in 1989, $4,261,000 in 1990, $4,142,000 in 1991, $4,040,000 in 1993, and $3,958,000 in 1993.

In a written opinion and judgment, the tribunal rejected petitioner's approaches to valuation. Reasoning that petitioner's cooperative approach was substantially similar to a mortgage/equity approach found to be a flawed method for valuing other subsidized housing in *Meadowlanes Ltd Dividend Housing Ass'n v Holland*, 437 Mich 473; 473 NW2d 636 (1991), the tribunal determined that petitioner failed to carry its burden of proof with respect to establishing the true cash value of the property. Recognizing its obligation to determine the most useful approaches for providing the most accurate valuation, the tribunal was persuaded by respondents' market approach based on the sales of federally subsidized housing in the same geographic area as petitioner's cooperative. It further found that it was necessary to adjust the resulting value to account for a lack of marketability and was persuaded by the method used by Anderson to calculate a thirty percent discount rate. However, unlike Anderson, the tribunal applied the discount rate to the entire value and determined that the true cash value of the property was $2,580,000 in 1984, $2,716,000 in 1985, $2,852,000 in 1986, $3,123,000 in 1987, $3,395,000 in 1988, $3,531,000 in 1989 and 1990, $3,667,000 in 1991, $3,531,000 in 1992, $3,395,000 in

1993, and $3,259,000 in 1994. The assessed value of the property for each tax year was fifty percent of its true cash value.

II

Petitioner contends that the tribunal made an error of law and adopted a wrong principle when it determined the true cash value of the property using a market approach rather than the cooperative approach. We disagree. Absent fraud, this Court's review of a Tax Tribunal decision is limited to determining whether the tribunal made an error of law or adopted a wrong legal principle. *Gillette Co v Dep't of Treasury*, 198 Mich App 303, 306; 497 NW2d 595 (1993). The tribunal's factual findings are upheld unless they are not supported by competent, material, and substantial evidence. *Golf Concepts v Rochester Hills*, 217 Mich App 21, 24; 550 NW2d 803 (1996). The tribunal's failure to base its decision on competent, material, and substantial evidence is an error of law requiring reversal. *Oldenburg v Dryden Twp*, 198 Mich App 696, 698; 499 NW2d 416 (1993).

The taxpayer bears the burden of proof with respect to the true cash value of property. MCL 205.737(3); MSA 7.650(37)(3); *Samonek v Norvell Twp*, 208 Mich App 80, 84; 527 NW2d 24 (1994).

> " '[C]ash value' means the *usual selling price* at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale . . . . In determining the value, the assessor shall also consider the advantages and disadvantages of location; quality of soil; zoning; existing use; present economic income of structures . . . ." [*Meadowlanes, supra* at 483-484, quoting MCL 211.27(1); MSA 7.27(1).]

"True cash value is synonymous with fair market value and is commonly determined by three different approaches: (1) cost less depreciation, (2) sales comparison, and (3) capitalization of income." *Samonek, supra* at 84. Variants of the approaches and new methods may be used if they are accurate and reasonably related to the fair market value of the property. *Meadowlanes, supra* at 485. Regardless of the approach used, the value determined must represent the usual selling price for the property. *Samonek, supra* at 84.

Petitioner argues that the tribunal erred in declining to adopt the cooperative approach for valuing § 221(d)(3) cooperatives approved by this Court in *Carriage House Cooperative v Utica,* 172 Mich App 144; 431 NW2d 406 (1988), and *Colonial Townhouses Cooperative v Lansing,* 171 Mich App 593; 431 NW2d 237 (1988). Petitioner maintains that the tribunal erred in interpreting the Michigan Supreme Court's decision in *Meadowlanes* as holding that the cooperative approach is a flawed valuation method. To resolve this question, we must revisit our prior decisions and determine whether a contrary result should be reached in light of the Supreme Court's decision in *Meadowlanes.*

In *Meadowlanes,* the Court held that the tribunal and this Court adopted a wrong principle by determining the true cash value of the property under a flawed appraisal method. The approach used by the tribunal consisted of the addition of an equity component and a mortgage component. *Id.* at 486, 489. The equity component was calculated by adding together the present value of (1) the property's maximum allowed cash flow from operations, (2) the value to

the investor of tax shelter benefits, and (3) the value of the property's reversionary interests. *Id.* at 487-488. The mortgage component was calculated by determining the cash equivalent value of the mortgage in the current mortgage paper market, i.e., the present value of the mortgage. *Id.* at 488. The *Meadowlanes* Court held that the approach was flawed because it was premised on the faulty notion that true cash value is not represented by the likely selling price of the property when the sale involves an assumable mortgage. *Id.* at 489-490. Therefore, the Court reasoned that the approach was improperly based on the cash equivalent value of the selling price and ignored the increase in value generated by the ability to borrow funds and pay off the loan with the earnings from the property. The Court also noted that under this flawed approach, the only persons paying ad valorem taxes predicated on the usual selling price would be those who either obtained new mortgages or paid cash. *Id.* The Court summarized:

> [The] approach is flawed because it values the property in large part by valuing its underlying mortgage in a theoretical commercial paper market. The primary and overriding influence in this method of valuation is the current mortgage interest rate. The second most important value influence is the stated interest rate on the property's underlying mortgage note. By placing such great weight on the discounted value of the underlying mortgage note, two identical properties, one built at a time when interest rates are high and the other when interest rates are low will have vastly disparate estimates of value under [the] approach. Thus, it violates the constitutional mandate of uniformity in real property taxation. [*Id.* at 492-493.]

The cooperative approach urged by petitioner and approved by this Court in *Carriage House* and *Colo-*

*nial Townhouses* is identical to the approach rejected by the Court in *Meadowlanes* and is similarly flawed. The approach involves the calculation of a mortgage component by determining the present value of a mortgage in the commercial paper market. Importantly, petitioner's appraiser acknowledged that the approach he used contains the flaw recognized by the *Meadowlanes* Court. Because the income received by a holder of a note with a higher interest rate is greater than that received by the holder of a note with a lower interest rate, the present value of the income stream is greater. As a result, property encumbered by a mortgage with a higher interest rate will have a greater value than identical property encumbered by a mortgage with a lower interest rate. Thus, the approach violates the principle of uniformity in real property taxation because it results in disparate estimates of the value of identical properties built under different market conditions. *Meadowlanes, supra* at 492-493. We therefore conclude that the cooperative approach is a flawed method for determining the value of § 221(d)(3) cooperatives. Accordingly, the tribunal properly rejected the approach followed in *Carriage House* and *Colonial Townhouses* because those cases no longer correctly state an accepted method of valuation for property of the kind involved in the instant case.

A

Petitioner also contends that the tribunal committed an error of law and adopted a wrong principle in using a market sales comparison approach to value the property. Again, we disagree. There is no single correct approach to valuing federally subsidized real

property. *Meadowlanes, supra* at 502. After rejecting the cooperative approach to valuation, the *Meadowlanes* Court directed that the three traditional approaches and variants thereof should be used in valuing the property both as private apartments and as federally subsidized housing. *Id.* Other approaches are also acceptable if they are demonstrated to be accurate and reasonably related to the fair market value of the subject property. *Id.* "[T]he final estimate of true cash value must represent the physical real estate and all the interests, benefits, and rights inherent in ownership of the subject real property." *Id.*

Petitioner argues that in using the market approach the tribunal erroneously relied on studies involving discounts for the lack of marketability of stock in closely held companies in determining the proper discount to account for the lack of marketability of petitioner's property. During its discussion regarding whether the tribunal properly considered a federal interest subsidy in its value determination, the *Meadowlanes* Court stated:

> An overriding theme in the decisions addressing the ad valorem taxation of federally subsidized real property is that the valuation process must consider both the positive and negative aspects of the regulatory agreement voluntarily entered into between the owner and the government. This comports with the well-established rule that all factors relevant to property value should be considered in the assessment process. [*Meadowlanes, supra* at 499-500.]

The Court specifically directed that "when using a sales-comparison approach, the appraiser should adjust the sales price of comparables for differences in size, age, condition, location, and other value influences that buyers and sellers of real property take

into account as opposed to the value influences considered by buyers and sellers of commercial paper." *Id.* at 503.

Here, the key value-influencing factor that must be considered is the restriction on the ability to sell the property at market value until the end of the mortgage period. Relying on studies concerning discounts for lack of marketability used when valuing stock in closely held companies and restricted stock in publicly held companies, respondents' appraiser estimated that a discount of thirty percent of equity (value minus debt) was an appropriate adjustment to account for the lack of marketability associated with a subsidized or regulated cooperative. According to Anderson, the costs and benefits of the low-interest mortgage and the restrictions on the property essentially balanced except for the lack of marketability. Anderson explained that the thirty percent discount was an average of the twenty-one to thirty-five percent results contained in the studies, and that he applied it only to the equity portion of the value because a sale is actually a sale of equity, not debt. The tribunal was persuaded by Anderson's method for calculating a thirty percent discount rate but applied the discount rate to the entire value instead of separating the equity and mortgage components.

Upon review of the materials in the record, we find that the tribunal did not err in using studies concerning the estimation of discounts for lack of marketability and minority interest used in valuing interests in closely held businesses for guidance in determining the appropriate discount to be applied in this case. Both parties agree that a discount rate should be used to adjust the value of comparable property to account

for differences in marketability. As with discounts for marketability and minority interest, a discount in the instant case is appropriate because the factor affects the liquidity or salability of the property. However, because of restrictions placed on the sale of § 221(d)(3) cooperatives, there is no market that can be consulted to determine the appropriate discount rate and, therefore, any determination of the usual selling price will involve a hypothetical sale. Although the studies consulted do not concern the valuation of real property, the tribunal properly reviewed them in determining the appropriate discount rate in this case because there was no available information regarding the discount rates for § 221(d)(3) cooperatives.

B

Petitioner also asserts that the discount rate should be eighty percent or higher, not the thirty percent used by the tribunal. We disagree. Application of a large discount would result in the property having a remarkably low value, and, contrary to Congress' intent, would operate as another subsidy to the property. *Meadowlanes, supra* at 500. Because true cash value is the usual selling price, a determination of the value of a § 221(d)(3) cooperative's property is inherently difficult because the property cannot be sold until the end of a forty-year period. In this case, the tribunal properly considered the traditional approaches to valuation and applied a discount rate to the value derived from a sales comparison approach in order to account for the restrictions placed on the property. Because the approach and valuation derived therefrom were supported by the evidence presented, the tribunal did not err or adopt

a wrong principle in using a sales comparison valuation approach with an adjustment for the lack of marketability associated with petitioner's property.

### III

Next, petitioner contends that the tribunal erred in allowing Anderson to testify at the tribunal hearing and in admitting both the appraisal and amendments thereto into evidence even though the appraisal was not filed until after a default had been entered against respondents. We disagree. This Court may review the tribunal's rulings regarding evidentiary issues if they involve errors of law. *Alhi Development Co v Orion Twp*, 149 Mich App 319, 323; 385 NW2d 782 (1986); see also *Vomvolakis v Dep't of Treasury*, 145 Mich App 238, 246-247; 377 NW2d 309 (1985). Petitioner initially argues that the tribunal erred in setting aside the default entered against respondents. Tribunal rules require the exchange of written appraisals within 120 days after the counsel conference. 1979 AC, R 205.1252(1). However, pursuant to its general power to issue orders altering discovery procedures "as justice may require to achieve a full and fair hearing of a matter before the tribunal," the tribunal may extend the date of the exchange. 1981 AACS, R 205.1275.

Despite the fact that the tribunal extended the time for the exchange of appraisals, respondents failed to timely file their appraisal. A party may be held in default if he fails to proceed as required by the rules or the tribunal, but the default may be set aside for reasons the tribunal "deems sufficient upon motion made within 20 days of entry of the order of default . . . ." 1979 AC, R 205.1247(4). We conclude that the tri-

bunal did not err in allowing respondents to cure the default by filing a motion to set it aside, and by filing the appraisal itself, within twenty days of the order. By filing the appraisal, respondents were again in compliance with the tribunal's orders.

Petitioner also asserts that the tribunal erred in admitting Anderson's testimony and appraisal because there was no good cause for respondents' failure to file the appraisal in a timely manner. We find no error requiring reversal. With the permission of the tribunal upon a showing of good cause, a witness may testify, and his appraisal may be admitted, even when the written appraisal was not supplied to the opposing party on time. 1979 AC, R 205.1252(1). Although it is error to admit a late appraisal if a party fails to offer a showing of good cause, *Community Associates v Meridian Charter Twp*, 110 Mich App 807, 812; 314 NW2d 490 (1981), this Court will not reverse on the basis of that error unless the opposing party demonstrates prejudice. *Id.*; *Kern v Pontiac Twp*, 93 Mich App 612, 623; 287 NW2d 603 (1979). Here, even if respondents failed to show good cause, petitioner was not prejudiced by the error in the admission of the late appraisal. Petitioner cross-examined Anderson at length and presented further arguments regarding Anderson's methods in a posthearing brief. The mere fact that the tribunal ultimately decided against petitioner is insufficient to establish prejudice. See *Ben P Fyke & Sons v Gunter Co*, 390 Mich 649, 657-658; 213 NW2d 134 (1973).

Petitioner next claims that the tribunal erred in allowing respondents to amend the appraisal at the tribunal hearing. We disagree. To ensure that a petitioner is afforded due process, hearings in the Tax

Tribunal are conducted in accordance with the provisions of Chapter 4 of the Administrative Procedures Act, MCL 24.271 *et seq.*; MSA 3.560(171) *et seq.* MCL 205.726; MSA 7.650(26). The parties must be given the opportunity to present evidence and arguments regarding issues of fact, cross-examine witnesses, and submit rebuttal evidence. MCL 24.272(3), (4); MSA 3.560(172)(3), (4). The rules of evidence must be followed as far as practicable, but the tribunal "may admit and give probative effect to evidence of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." MCL 205.746(1); MSA 7.650(46)(1); MCL 24.275; MSA 3.560(175). In the instant case, because the amendments were of an appraisal that was probative of the true cash value of the property, and because petitioner was provided an opportunity to cross-examine Anderson and present arguments in a posthearing brief, we conclude that the tribunal properly admitted the amendments into evidence.

IV

Finally, petitioner contends that the tribunal erred in ordering that the studies and articles relied on by respondents' appraiser in determining the discount rate used in his valuation approach be submitted after the hearing. We disagree. The tribunal did not err in admitting the evidence because there was no comparable information regarding the appropriate discount for the lack of marketability of a § 221(d)(3) cooperative. Furthermore, the tribunal did not err in ordering that the evidence be submitted after the hearing. See MCL 24.275; MSA 3.560(175). In light of the Tax Tribunal's wide latitude in the admission of evidence, we

conclude that the tribunal sufficiently protected petitioner's due process rights by establishing a posthearing procedure, including the submission of briefs, by which it could challenge the use of the studies and articles. See *Winokur v State Bd of Dentistry*, 366 Mich 261, 265; 114 NW2d 233 (1962); *Young v Liquor Control Comm*, 39 Mich App 101, 103; 197 NW2d 295 (1972).

Affirmed.