# STATE OF MICHIGAN

# COURT OF APPEALS

HARTLAND GLEN DEVELOPMENT, L.L.C.,

UNPUBLISHED
October 20, 2015

Petitioner-Appellant,

v

No. 321347
Tax Tribunal
LC Nos. 00-423343
            00-427021

TOWNSHIP OF HARTLAND,

Respondent-Appellee.

Before: M. J. KELLY, P.J., and MURRAY and SHAPIRO, JJ.

PER CURIAM.

Petitioner, Hartland Glen Development, L.L.C., appeals by right the Michigan Tax Tribunal's opinion and judgment affirming the special sewer assessments levied by respondent, Hartland Township, and, in particular, the Township's changes in 2011 to the initial assessments that were made in 2005. Because Hartland Development failed to establish the existence of any error that warrants relief, we affirm.

Hartland Development owns a 36-hole golf course located in the Township, which comprises 383.58 acres and includes a clubhouse. As this Court discussed in a related appeal,[1] the Township established a special assessment on this property and four other parcels owned by Hartland Development in 2005:[2]

> With respect to the specific nature of the special assessments that encumbered the property, the [Tax Tribunal] recited the following facts:
>
> > A $792,000 Special Assessment was levied in 2005 for 144 Residential Equivalent Units ("REUs") for residential unit sewer taps. The annual payments were $71,000. In 2011, the Township

---

[1] *Hartland Glen Dev, LLC v Hartland Twp*, unpublished opinion per curiam of the Michigan Court of Appeals, issued February 19, 2015 (Docket No. 318843), lv pending.

[2] The related case involved the valuation of the property and whether the special assessment affected its true cash value. This Court remanded the case for further proceedings, but directed that the proceedings should await resolution of this appeal. *Hartland Glen*, unpub op at 9.

-1-

corrected the Special Assessment and levied $2,364,596.85 for 603.14 REUs (Resolution 11–R032). [The Township] also levied a Supplemental Special Assessment of $199,488.76 (Resolution 11–R034) in 2011.[1]

The appraiser hired by the township as its expert provided a bit more detail in his appraisal regarding the special assessments, observing:

> A significant portion of the outstanding real property taxes due are associated with a special assessment for sewer that began in 2005. The special assessment district originally allocated the REUs to the various ownership groups in the district, which were then divided equally across the various tax parcels each group owned. However, in 2011 the REUs were reallocated across the various tax parcels based on acreage, along with creating an additional supplemental assessment district to assess additional costs incurred by the district. The original district assigned 144 REUs to the subject parcel, which was part of a larger group of parcels then controlled by the subject owner. The original special assessment had a principal cost of $792,000 that was spread across a 20–year declining balance payment schedule at 5.25% interest. However, in 2011 the REUs were reallocated with 603.14 REUs assigned to the subject parcel, resulting in a principle amount of $2,364,596.85 being outstanding.[2] In addition, a supplemental special assessment for additional costs in the principle amount of $199,448.70 was also created, which was spread across a 15–year declining balance payment schedule at 5.50% interest.

[Hartland Development] failed to make the annual installment payments regarding the special assessments by the time of the tax dispute, and [it] is currently in default. There are of course more scheduled "special assessment" installment payments due in the future.

---

[1] [Hartland Development] and the township entered into a contract regarding the original 2005 special assessment for 144 REUs, but [Hartland Development] did not agree with the 2011 corrected and supplemental special assessments, which led to litigation, with an appeal currently pending in this Court in [this appeal].

[2] According to the associated township resolution, the $2,364,596 was to be paid in 14 annual installments at an interest rate of 5.5 percent per annum. [*Hartland Glen*, unpub op at 1-2].

---

In this case, Hartland Development challenges both the supplemental special assessment of $199,448.70 and the transfer of the additional 459.14 REUs to the subject property. It further raises claims of judicial and collateral estoppel, and questions the valuations used to determine whether the special assessments were, or remained, proportionate to the value of the property.

## I. ESTOPPEL

Hartland Development first argues that the Township should have been judicially estopped from asserting that the 2011 transfer of REUs from the foreclosed properties to the golf course was proper and authorized. The trial court addressed this issue in the context of deciding the parties' cross-motions for summary disposition. We review de novo a trial court's decision granting or denying a motion for summary disposition. *Hawkins v Mercy Health Services, Inc*, 230 Mich App 315, 324; 583 NW2d 725 (1998). Whether the doctrine of collateral estoppel properly applies is a question of law that we review de novo. *McMichael v McMichael*, 217 Mich App 723, 727; 552 NW2d 688 (1996).

In *Paschke v Retool Indus*, 445 Mich 502, 509-510; 519 NW2d 441 (1994), our Supreme Court adopted the prior success doctrine of judicial estoppel:

> The doctrine of judicial estoppel first emerged in the mid 1800s, in a Tennessee case, *Hamilton v Zimmerman* . . . . In *Hamilton*, the court determined that the plaintiff was estopped from maintaining a position inconsistent with one he had asserted under oath in an earlier judicial proceeding. Sometimes described as the doctrine against the assertion of inconsistent positions, judicial estoppel is widely viewed as a tool to be used by the courts in impeding those litigants who would otherwise play "fast and loose" with the legal system. Since *Hamilton*, the doctrine has been adopted by most state and federal courts, in slightly varying forms.

> In the context of the administrative proceedings at issue, we adopt the "prior success" model of judicial estoppel: Under this doctrine, a party who has *successfully* and unequivocally asserted a position in a prior proceeding is estopped from asserting an inconsistent position in a subsequent proceeding. Under the "prior success" model, the mere assertion of inconsistent positions is not sufficient to invoke estoppel; rather, there must be some indication that the court in the earlier proceeding accepted that party's position as true. Further, in order for the doctrine of judicial estoppel to apply, the claims must be wholly inconsistent. [Quotation marks, citations, and footnotes omitted.]

Hartland Development acknowledges that Livingston County, not the Township, was the party involved in the prior foreclosure proceedings involving these properties, and that the state of Michigan was the actual petitioner in the foreclosure action. Therefore, although it was asserted that the Township's assessments were valid in the foreclosure proceedings, the Township itself did not "successfully and unequivocally [assert] a position in a prior proceeding" because it was not a party to those proceedings. The fact that the Township ultimately purchased the foreclosed properties does not change this fact.

-3-

Further, to the extent that Hartland Development's privity argument is applicable to its claim for judicial estoppel, we conclude that it cannot establish privity in this instance. In *Phinisee v Rogers*, 229 Mich App 547, 553-554; 582 NW2d 852 (1998), this Court observed:

> In *Sloan v Madison Heights*, 425 Mich 288, 295-296; 389 NW2d 418 (1986), our Supreme Court defined "privity" as follows: "In its broadest sense, privity has been defined as 'mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right.' " (Citation omitted). Black's Law Dictionary (6th ed), p 1199, defines privity as
>
>> mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right. . . . [It] signifies that [the] relationship between two or more persons is such that a judgment involving one of them may justly be conclusive upon [the] other, although [the] other was not a party to [sic] lawsuit.
>
> "Privity between a party and a non-party requires both a 'substantial identity of interests' and a 'working or functional relationship . . . in which the interests of the non-party are presented and protected by the party in the litigation.' " *SOV* [*v Colorado*, 914 P2d 355, 360 (Colo, 1996)], quoting *Public Service Co v Osmose Wood Preserving, Inc*, 813 P2d 785, 787 (Colo App, 1991).

Hartland Development must demonstrate that, at the time of the foreclosure action, Livingston County and the state of Michigan, as well as the Township, had both a "substantial identity of interests" and a "working or functional relationship" in which the interests of the Township, a non-party to the foreclosure proceedings, were presented and protected by Livingston County, the party in that litigation. *Phinisee*, 229 Mich App at 554.

Although in slightly different iterations, our Supreme Court has stated that a township and a county are not in privity. For example, in a case involving a consent judgment concerning an ad valorem property tax exemption given by the township to tribal member property owners, our Supreme Court held that the consent judgment did not bind the county, stating that "privity does not exist in this case to bind the state by a judgment entered into by a subordinate political division." *Baraga Co v State Tax Comm*, 466 Mich 264, 271; 645 NW2d 13 (2002). The Court further held that, rather than "focusing on the fact that the townships carry out the same set of property tax laws that defendant is required to enforce," this Court "should have focused on the differing roles of the townships, to carry out the tax laws, versus defendant, to step in if the townships fail to carry out their duties." *Id*. at 271-272. Also instructive is *Sal-Mar Royal Vill, LLC v Macomb Co Treasurer*, 497 Mich 908; 856 NW2d 68 (2014), in which our Supreme Court stated that a township is not empowered to represent the county with respect to "matters incidental to delinquent tax collection," and also noted that the "statutory tax regime contemplates that the two governmental units had differing obligations . . . and potentially conflicting interests if the county was unable to collect delinquent taxes for which it had previously reimbursed the township . . . ." Here, then, where the Township had failed in its role to collect the money Hartland Development owed for the special assessment on the foreclosed

properties, and Livingston County stepped in to collect, the county was not acting in privity with the Township, but had different statutory obligations and a potentially conflicting interest.

Nor is the Township's position in this case "wholly inconsistent" with its former "position" that the REUs were initially properly assessed against the four foreclosed parcels. To the contrary, the Township's positions in this case were that, because of Hartland Development's failure to pay the assessments on the foreclosed property, the resulting shortfall could be recovered under MCL 41.732 and that, as a result of "disproportionate" assessments, or disparate treatment of different property owners, given the way some of the properties were initially assessed, that once the error was discovered, the corrections were authorized under MCL 41.733. These positions are not inconsistent with the Township's initial REU assessments, but were premised on later developments. As the Township correctly states, the circuit court could not have ruled on something that had not yet occurred. In addition, nothing here suggests that the Township is attempting to play "fast and loose" with the legal system.

With respect to Hartland Development's concurrent claim, the doctrine of collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was actually litigated and necessarily determined. *People v Gates*, 434 Mich 146, 154; 452 NW2d 627 (1990). As discussed, Hartland Development cannot show that the Township and the county were in privity with each other. Also, as with judicial estoppel, the issues presented in this appeal concerning the 2011 supplemental assessments and the changes to the initial REU allocations were not actually litigated and decided in the earlier proceeding.

Accordingly, Hartland Development is not entitled to relief on the basis of either collateral or judicial estoppel.

## II. THE ASSESSMENTS

Hartland Development next argues that the Tax Tribunal erred when it determined that the Township had the authority to rescind the initial 2005 special assessment roll and promulgate a corrected roll. "Absent fraud, this Court's review of a Tax Tribunal decision is limited to determining whether the tribunal made an error of law or adopted a wrong legal principle." *Georgetown Place Coop v City of Taylor*, 226 Mich App 33, 43; 572 NW2d 232 (1997). The Tax Tribunal's factual findings are conclusive if supported by competent, material, and substantial evidence on the whole record. *Danse Corp v City of Madison Hts*, 466 Mich 175, 178; 644 NW2d 721 (2002). Substantial evidence must be more than a scintilla of evidence, although it may be substantially less than a preponderance of the evidence. *Jones & Laughlin Steel Corp v City of Warren*, 193 Mich App 348, 352-353; 483 NW2d 416 (1992). This Court reviews de novo the proper construction of a statute. *Williams v Enjoi Transp Solutions*, 307 Mich App 182, 185; 858 NW2d 530 (2014).

In *Hannay v Dep't of Transp*, 497 Mich 45, 57; 860 NW2d 67 (2014), our Supreme Court clarified how courts should interpret statutes:

> The role of this Court in interpreting statutory language is to "ascertain the legislative intent that may reasonably be inferred from the words in a statute." In

doing so, "[c]ourts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that renders nugatory or surplusage any part of a statute." This Court has explained:

> When construing a statute, we consider the statute's plain language, and we enforce clear and unambiguous language as written. While terms must be construed according to their plain and ordinary meaning, words and phrases as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.

> "[W]ords and phrases used in an act should be read in context with the entire act and assigned such meanings as to harmonize with the act as a whole," and "a word or phrase should be given meaning by its context or setting." [Footnotes omitted.]

In addition, "[t]he construction of a statute by a state administrative agency charged with administering it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons." *Mich Farm Bureau v Dep't of Environmental Quality*, 292 Mich App 106, 129; 807 NW2d 866 (2011) (citation and quotation marks omitted). However, such an interpretation, even a longstanding one, is not binding on the courts and cannot conflict with the intent of the Legislature as expressed in the plain language of the statute. *Id.* at 130.

Much of Hartland Development's argument with respect to this issue and other issues is premised on its misconception and conflation of the statutory authority for the recovery of insufficient funds through a supplemental assessment and the authority to correct an incorrect allocation of REUs. This, in turn, has led to conflicting claims that the 2011 changes to the REU allocations amounted to an "invalidation" of the 2005 assessment and an entirely new assessment, but were not authorized under MCL 41.732 because the REUs were not allocated in a "pro rata" manner, even though, as hereinafter discussed, MCL 41.732 applies only to supplemental assessments made to the initial assessment. MCL 41.733, not MCL 41.732, applies to the reallocation of REUs.

We further conclude that Hartland Development improperly relies on Resolution 04-09-01, promulgated in September 2004, which it maintains was distributed to property owners to attempt to recruit them. The parties signed a special assessment contract in May 2015. The contract, signed by Isam Yaldo and other representatives of Hartland Development, did not contain an REU-transfer restriction similar to the one found in an earlier policy statement restriction. In addition, the contract contained a merger clause and did not specifically reference the earlier resolution to "save" it from merger. This Court has held that "when the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete 'on its face' and, therefore, parol evidence is necessary for the 'filling of gaps.' " *UAW–GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 502; 579 NW2d 411 (1998) (citation omitted). The

existence of a merger clause makes it unreasonable for a party to rely on earlier representations not included in the agreement. *Id*. at 504.

The Legislature provided townships with the authority to make special assessments to recover a shortfall:

> Should the assessments in any special assessment roll prove insufficient for any reason, including the noncollection thereof, to pay for the improvement for which they were made or to pay the principal and interest on the bonds issued in anticipation of the collection thereof, then the township board shall make additional pro rata assessments to supply the deficiency, but the total amount assessed against any parcel of land shall not exceed the value of the benefits received from the improvement. Should the total amount collected on assessments prove larger than necessary by more than 5% of the original roll, then the surplus shall be prorated among the properties assessed in accordance with the amount assessed against each and applied toward the payment of the next township tax levied against such properties, respectively, or if there be no such tax then it shall be refunded to the persons who are the respective record owners of the properties on the date of the passage of the resolution ordering such refund. Any such surplus of 5% or less may be paid into the township contingent funds disposed of as above provided. [MCL 41.732.]

The Legislature also authorized townships to correct an original assessment that was invalid by reason of an irregularity:

> Whenever any special assessment shall, in the opinion of the township board, be invalid by reason of irregularities or informalities in the proceedings, or if any court of competent jurisdiction shall adjudge such assessment to be illegal, the township board shall, whether the improvement has been made or not, whether any part of the assessment has been paid or not, have power to proceed from the last step at which the proceedings were legal and cause a new assessment to be made for the same purpose for which the former assessment was made. All proceedings on such reassessment and for the collection thereof shall be conducted in the same manner as provided for the original assessment, and whenever an assessment or any part thereof levied upon any premises has been so set aside, if the same has been paid and not refunded, the payment so made shall be applied upon the reassessment. [MCL 41.733.]

Therefore, MCL 41.732 governs the Township's decision to assess Hartland Development an additional $199,448.70 due to a shortfall in the collections of the initial assessment, while MCL 41.733 governs its decision to reallocate the REUs applied to the original assessment.

With respect to the supplemental assessment, the Township evaluated how Hartland Development's failure to pay its initial assessment, as well as other issues, caused a shortfall in the amount the Township needed to pay its bonds and deal with further projected costs. There was testimony that, once the Township determined that the shortfall existed, it hired experts to determine the amount of the projected shortfalls and explored various options, such as

refinancing some of the construction bonds and purchasing the foreclosed properties. The Township decided to spread some of the loss back to property owners through a supplemental assessment under MCL 41.732. Once it determined that a shortfall existed, even if the shortfall arose out of the Township's inability to collect on the initial assessment, MCL 41.732 required it to issue a pro rata supplemental assessment. Hartland Development has presented nothing to show that this action was not within the Township's authority.

With respect to the REU reallocation, Hartland Development cannot show that the Township did not have the authority to act under MCL 41.733. Hartland Development relies on the idea that, because the parties agreed on the initial allocation of REUs, the process by which the REUs were allocated could not later be found to have been irregular or involved "informalities" that justified revisiting the allocations.

Regarding "informalities," Hartland Development correctly notes that the language in the special assessment contract does not contain a specific waiver of any formal special assessment agreement proceedings, including any notice provisions or public hearings. The agreement also provides, in pertinent part:

> REPRESENTATIONS, WARRANTIES AND CERTIFICATIONS. With regard to the special assessments to be levied in accordance with the Contract, the Developer represents, warrants, and certifies to the Township:
>
> * * *
>
> c. The Special Assessment to be levied against the parcel(s) is proportional to the benefit received by the parcel(s) from the Project.
>
> d. [T]here is a reasonable relationship between the total amount of the special assessment levied against the parcel(s) . . . and the enhanced fair market value of the parcel(s) due to the Project, and the amount of the special assessment to be levied against the parcel(s) . . . is reasonably proportionate to the amount of the enhanced fair market value which shall accrued to the parcel(s) as a result of the Project[.]

Therefore, had the Township based its decision to reassess under MCL 41.733 because of "informalities" in the setup of the initial assessment or the method in determining whether the total number of REUs benefited the parcels, Hartland Development would arguably be correct that the Township could not simply begin again in the middle of the proceedings. However, the Township did not use this rationale when deciding to reallocate in 2011, and neither party argues that any procedural problem, such as a lack of notice, applies here.

With respect to "irregularities," however, Hartland Development is incorrect in its assertion that the Township could not find that reallocation was necessary due to the initial way the REUs were allocated. There were certainly irregularities in the way the initial allocation was handled. And although the parties agreed that the total number of 720 REUs were appropriate to all of Hartland Development's properties at the time they executed the special assessment agreement, this itself did not preclude the Township from revisiting how the REUs should be allocated as among the parcels. Specifically, the language concerning proportionality is in the

-8-

portion of the agreement listing Hartland Development's representations, and does not appear to reflect an agreement by the Township that the allocations were correct with respect to each parcel. The Township was not foreclosed from acting, if necessary, under MCL 41.733. Moreover, despite the initial agreement, the Township was still required to ensure that the cost of the special assessment be lawfully proportionate to the benefit. Once the parcels were no longer "contiguous" after the foreclosure sale, the Township was warranted in reassessing the parcels to ensure that this was still the case.

Nor has Hartland Development shown that the Township erred in its application of MCL 41.733, at least procedurally. Hartland Development appears to argue that, once any error was found in the REU allocation, the Township was required to proceed from the beginning. Essentially, Hartland Development argues that there was no legal "last step" from which to proceed, or that such a last step necessarily involved obtaining its re-approval regarding how many REUs it wanted assigned to the golf course.

Undercutting Hartland Development's position is the testimony of its own principal, Isam Yaldo, who admitted that it was his understanding that any of the 720 initially allocated REUs could be moved to any of Hartland Development's properties in the township, and that he relied on this when deciding whether to have Hartland Development join the district. Hartland Development's argument that the initial allocation of REUs was based on anything other than a placeholder to be reallocated depending on future development is thus without merit. The initial allocation was, essentially, for Hartland Development's convenience.

The Township's reassessment did not change the fact that, as to the number of total REUs in its five parcels, Hartland Development wanted 720 and the parties agreed that this was an appropriate amount given Hartland Development's future plans. Therefore, the Township could find that the "irregularity" involved in the initial assessment occurred, not at the point where the parties agreed on how many REUs in total were needed or useful, but when, rather than providing for more flexibility and simplicity in dividing the 720 REUs, the parties should have reviewed the likely REUs that would be used by each property. Because the properties had differing acreage and building characteristics, the Township could reasonably find that the initial "irregularity" in the REU allocation, which was not tied to actual probable future land use, constituted an invalid decision. The Township then could, and did, proceed from the "legal" "last step" of determining how many REUs in total were appropriate and continue to "cause a new assessment to be made for the same purpose for which the former assessment was made" by reallocating the REUs.

Despite Hartland Development's objection, the Township did not saddle it with "additional" REUs. Instead, the Township reallocated the REUs that Hartland Development initially sought for their parcels in lieu of how those REUs would likely be used. Nor can Hartland Development show that it was unfairly put upon, or singled out, for disparate treatment. Although not all the owners who initially joined the special assessment district had their REUs reallocated, there was testimony that those with contiguous parcels, or at least initially contiguous parcels, did have their REU allocations revisited as well.

Hartland Development's claim that the Township violated MCL 41.732 because the REU changes to all of the owners' properties were not done on a "pro rata" basis is also without merit. MCL 41.733, not MCL 732, applies to the REU reallocation, and MCL 41.733 does not contain language stating that the "redo" must contain pro-rata revisions.

Hartland Development additionally maintains that the statute requires that the "proceedings on such reassessment" be "conducted in the same manner as provided for the original assessment," but that phrase refers to "the collection" of the special assessment. MCL 41.733. And, even if this phrase could be said to apply to other "proceedings" concerning the assessment, this would pertain to any required procedural requirements, such as notice, or the determination that the additional REUs benefited the subject property. It did not require the Township to obtain permission before moving REUs, particularly here where that provision was not included in the special assessment contract.

## III. VALUATION

Hartland Development next argues that the Tax Tribunal erred when it allowed the Township to assert that the valuation date for the 2011 assessments should be 2005. Hartland Development argues that the 2011 actions were new assessments that required a valuation date in 2011. However, it does not claim that any error in the valuation date of the property caused any prejudice to it. Hartland Development does not, for example, provide baseline true market valuations from 2005 and 2011 to show how general market forces rendered the true market value in 2011 less or greater than it was in 2005. Notwithstanding Hartland Development's claims below that the Tax Tribunal adopted the wrong true market value, including the improvements, in its overall decision, Hartland Development has not shown how any error with the valuation date exacerbated the Tax Tribunal's decision that the property should be assessed as if it were zoned for planned development rather than for conservation agriculture. Nor did Hartland Development address this below. It also does not discuss the language of MCL 41.733 and whether it requires a different valuation date for the REU allocation than MCL 41.732, which applies to the supplemental assessment. "It is axiomatic that where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court." *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). We thus decline to address this issue further.

## IV. PROPORTIONATE

Hartland Development lastly argues that the Tax Tribunal erred in finding that the corrected and supplemental assessments were proportionate to the benefit conferred on the subject property. "The taxpayer bears the burden of proof with respect to the true cash value of property." *Georgetown Place Coop*, 226 Mich App at 43.

In order to challenge the validity of a special assessment, a petitioner must demonstrate a substantial or unreasonable disproportionality using a comparison of the true value of the property with and without the benefits conferred by assessment and then compare that against the cost of the assessment. See *Michigan's Adventure, Inc v Dalton Twp*, 290 Mich App 328, 335; 802 NW2d 353 (2010). The validity of a special assessment is not solely reviewed using a "dollar-for-dollar" comparison:

When reviewing the validity of special assessments, it is not the task of courts to determine whether there is a rigid dollar-for-dollar balance between the amount of the special assessment and the amount of the benefit. Rather, a special assessment will be declared invalid only when the party challenging the assessment demonstrates that "there is a substantial or unreasonable disproportionality between the amount assessed and the value which accrues to the land as a result of the improvements. [*Kadzban v City of Grandville*, 442 Mich 495, 502; 502 NW2d 299 (1993) (opinion by Griffin, J.) (quotation omitted)].

This review necessitates a finding of fact by the Tax Tribunal, which will be upheld unless it is not supported by competent, material, and substantial evidence on the whole record. *Id*. This question in turn requires a determination of true cash value for the valuation date.

The Michigan Constitution provides that real property is to be taxed on the basis of its true cash value. See Const 1963, art 9, § 3. " 'Highest and best use' is a concept fundamental to the determination of true cash value. It recognizes that the use to which a prospective buyer would put the property will influence the price which the buyer would be willing to pay." *Edward Rose Bldg Co v Independence Twp*, 436 Mich 620, 633; 462 NW2d 325 (1990).

MCL 211.27(1) provides, in pertinent part, that "'true cash value' means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale." In determining true cash value, the assessor must consider the "existing use" of the property. MCL 211.27(1). However, this Court has held that this does not preclude consideration of other potential uses, in particular where " 'where such [current] use bears no relationship to what a likely buyer would pay for the property[.]' " *Detroit Lions, Inc v City of Dearborn*, 302 Mich App 676, 698; 840 NW2d 168 (2013), quoting *Safran Printing Co v Detroit*, 88 Mich App 376, 382; 276 NW2d 602 (1979). This does not mean, however, that the existing use cannot be used to determine the property's usual selling price. *Id*. "A highest and best use determination 'requires simply that the use be legally permissible, financially feasible, maximally productive, and physically possible.' " *Id*. at 697, quoting *Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 285; 730 NW2d 523 (2006). In reaching a determination of true cash value "the tribunal is not bound to accept either of the parties' theories of valuation. It may accept one theory and reject the other, it may reject both theories, or it may utilize a combination of both in arriving at its determination." *Jones & Laughlin Steel Corp*, 193 Mich App at 356.

Hartland Development's argument centers on the parties' relative appraisals and the Tax Tribunal's decision that Hartland Development's expert failed to adequately account for the fact that the highest and best use of the property would be as if the entire property were zoned planned development rather than the current conservation agriculture designation for most of the parcel. Regarding the actual valuation, Hartland Development briefly asserts that "[m]ost critical herein is the fact that the cost of the corrected and supplemental 603.14 REUs to the tune of $3,516,718.70 far exceeds the alleged increased benefit to the property, which the [Tax Tribunal] found to be only $2,660,000.00." However, the $2,660,000 figure came from Hartland Development's expert, who valued the property with only the 144 initial REUs and with its

-11-

existing use; it was not a finding of value by the Tax Tribunal. Moreover, as the Tax Tribunal noted, Hartland Development's own expert admitted that each REU provided a $2,000 value addition to the property over the cost of the special assessment for that REU.

In support of its underlying finding that a planned development use would be the highest and best use for the property, the Tax Tribunal relied on testimony from the Township's planning and zoning administrator, David Campbell, its appraiser, James Hartman, Hartland Development's principal, Yaldo, and the evidence of Hartland Development's "marketing efforts . . . to various entities for units in excess of 600 units" to determine that planned development was the highest and best use. This finding is fully supported by the testimony. In addition, while Hartland Development claims that Hartman did not properly consider or check with the planning and zoning administrator to find that the most likely rezoning would be planned development, Hartman specifically stated that he spoke with Campbell and that he based his appraisal on Campbell's evidence. Moreover, because Campbell was the Township's planning director and testified in favor of rezoning to planned development, Hartland Development's arguments on this issue are without merit.

With respect to the soil conditions of the property, Hartland Development is correct that, as a measure of the true cash value of the property, one of the conditions to be evaluated is the "quality of soil" of the subject parcel. MCL 211.27(1). However, while Hartland Development presented evidence that the soil was perhaps not as amenable to building as other properties due to the water table, among other things, it did not present expert testimony regarding how that factor affected the true cash value. For example, incurring a greater cost of building houses on a lot due to a greater footing cost or having to build the home above the water table and then bring in fill dirt, does not necessarily equate to being unable to build on the lot at all. Even Hartland Development's appraiser acknowledged that, while he received the soils report prepared by McDowell & Associates in 2004, he did "not specifically" adjust his valuation based on the soil report, and could not quantify what effect the soils would have on the value of the property. Because Hartland Development did not meet its burden of demonstrating how the property's soil quality would quantifiably limit the value of the property, it was not error for the Tax Tribunal to find that there was no basis for taking the property of the soil into account. *Georgetown Place Coop*, 226 Mich App at 43.

The Tax Tribunal did err in finding that the highest and best use for the property was with planned development zoning, and therefore, did not err in finding that the special assessment was valid because the benefits of the special assessments to the subject property outweighed the costs.

## V. CONCLUSION

Hartland Development has not established any errors that warrant relief.

Affirmed.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Douglas B. Shapiro

-12-